UNITED STATES DISRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GERMANTOM INTERNATIONAL GMBH, | No. _____ |
| Plaintiff, | ECF Case |
| vs. | **COMPLAINT** |
| EPOCH TIMES INC., UNIVERSAL COMMUNICATIONS NETWORK INC. D/B/A UNIVERSAL COMMUNICATIONS NETWORK NY OR NEW TANG DYNASTY, NEW TANG DYNASTY TELEVISION INC., NEW TANG DYNASTY, ZHONG JOHN TANG | JURY TRIAL DEMANDED |
| collectively, Defendants | |

Germantom International GmbH ("Germantom"), by and through their attorneys Schumann Burghart LLP, as and for its Complaint, alleges as follows:

### THE PARTIES

1.      Germantom is a German corporation, having a principal place of business at Zeppelinstraße 10, 76530 Baden-Baden, Germany.  Germantom is in the business of operating individual online department stores/shops and advertisement platforms for innovative German and European high-quality products targeting the global market. Germantom is also involved with manufacturers, trade, logistics as well as marketing service providers in connection with national and international product launches.

2.      Upon information and belief, Epoch Times Inc. ("Epoch Times"), is a New York business corporation with a place of business at 229 W. 28th Street, 6th Floor, New York, New York 10001, USA. Epoch Times is a news media company (see https://www.the

−1−

epochtimes.com/about-us).

3.     Upon information and belief, Universal Communications Network Inc. d/b/a Universal Communications Network NY or New Tang Dynasty ("Universal Communications Network"), is a New Jersey not-for-profit corporation authorized to do business in the State of New York with a place of business at 229 W. 28th Street, 7th Floor, New York, New York 10001, USA. Universal Communications Network is a news and entertainment media company. Upon information and belief, NTD.tv is a division of Universal Communications Network (*see* further www.ntd.com/terms-of-service.html; https://www.ntd.com/about.html).

4.     Upon information and belief, New Tang Dynasty ("New Tang Dynasty") is a New York not-for-profit corporation with a place of business at 229 W. 28th Street, Suite 1200, New York, New York 10001, USA.  New Tang Dynasty is a news and entertainment media company.

5.     Upon information and belief, New Tang Dynasty Television Inc. ("New Tang Dynasty Television") is a New York business corporation with a place of business at 229 W. 28th Street, 7th Floor, New York, New York 10001, USA. New Tang Dynasty Television is a news and entertainment media company.

6.     Upon information and belief, Zhong John Tang ("Mr. Tang") is a founder and shareholder of Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television. Upon information and belief, Mr. Tang has his business address at 229 W. 28th Street, 7th Floor, New York, New York 10001, USA.  Mr. Tang, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television are hereinafter collectively referred to as the "Defendants."

## JURISDICTION AND VENUE

7.     This court possesses subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the amount in controversy exceeds $75,000.

8.     Venue is proper in this District under 28 U.S.C. §§1391(b)(1), 1391(d) because Defendants' corporate headquarters and/or offices are located in this District at 229 W. 28th Street, Suite 1200, 6th Floor, 7th Floor, New York, New York 10001, USA, and they would thereby be considered residents of this District if it was a separate state.

9.     Further, venue is proper in this District under 28 U.S.C. §§1391(b)(1), 1391(d) because Mr. Tang's business address is located in this District at 229 W. 28th Street, 7th Floor, New York, New York 10001, USA.

## THE FACTS

10.    Upon information and belief, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television, both individually, in groups or collectively, were and are conducting their news and entertainment media business operations, at least in part, under the same name and umbrella Epoch Media Group ("EMG";
*see* further www.epochmediagroup.com/brand.html,   www.ntd.com/terms-of-service.html, www.theepochtimes.com/terms-of-service,           https://www.theepochtimes.com/copyright-infringement-notification,  notification screenshots and excerpts of which are attached hereto as Exhibit A).

11.    Upon information and belief, EMG is, however, neither incorporated as legal entity nor is EMG registered to do business in the State of New York but uses a business address at   229   W.   28th   Street,   New   York,   New   York   10001,   USA   (*see*

www.epochmediagroup.com/contact.html), the same address as Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television and Mr. Tang.  Upon information and belief, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television conduct business under and in the name of EMG to disguise their own legal entities and corporate structure, and to avoid contractual liabilities.

12.    Upon information and belief, EMG consists of a group of various global media network companies providing multilingual print and digital publications, an international television network, and digital advertising and technology services and acts as an umbrella for those companies (*see* further www.epochmediagroup.com/brand.html). EMG is an experienced media network platform provider, which has a fast-growing media network of around 100 online newspapers in 21 languages. EMG also distributes several millions of printed daily or weekly newspapers, for example in Hong Kong or New York (*see* hhtp://www.epochmediagroup.com). EMG manages the brands Epoch Times Newspapers and Website, Youmaker and NDT Television.

13.    Upon information and belief, Epoch Times Europe GmbH, a German corporation, is also part of the Epoch Media group of companies, having its principal place of business at Kunz-Buntschuh-Strasse 11, 14193 Berlin, Germany (*see* http://www.epochtimes.de).  Mr. Manyan Ng ("Mr. Ng"), with an address at Lärchenweg 18a, 69517 Gorxheimertal, Germany, is the CEO ("Geschäftsführer") and 50% shareholder of Epoch Times Europe GmbH.

14.    On or about March 2017, Mr. Ng approached Harald M. Wayer, the Chief Executive Officer of Germantom ("Mr. Wayer"), with a request to assist Mr. Ng in

implementing a business model for EMG in order to enable EMG to achieve more independence

from the advertisement revenues of Google. According to his own repeated statements, Mr. Ng

had strong ties to Mr. Tang and EMG in New York and shared a deep friendship with Mr. Tang.

15.     According to Mr. Ng's representations and the information available on

EMG's website, EMG had 120 million unique users at this time.

16.     Mr. Wayer believed that by working with EMG he would be working with

a network of globally operating news and entertainment companies.

17.     In response to Mr. Ng's request, Mr. Wayer therefore developed the idea

to operate international online shops by using the huge volume of EMG's media network

worldwide (including the Epoch Times Europe GmbH) for marketing and advertisement

purposes.

18.     On or about March 30, 2017, Mr. Wayer sent Mr. Ng a detailed E-mail,

which has been translated into English and attached hereto as Exhibit B. The E-mail set forth the

key terms of a cooperation by and between Germantom and EMG, based on the earlier

discussions between Mr. Ng and Mr. Wayer. The E-mail, dated March 30, 2017 is hereinafter

summarized as follows:

- A company of Mr. Wayer will develop an international online shop, which
  will be made available to the customers in English, Chinese and German
  languages in pertinent countries.

- The high-quality products will include, but are not limited to German and
  European technical products, cosmetics, non-drug related pharma
  products, E-bikes, household goods etc.

- A company of Mr. Wayer will be solely responsible for all costs in

connection with developing the international online shop. Those estimated aggregate costs of EUR 500,000.00 would include, among others, the purchase of the high-quality products, the establishment of the accounting team excluding any marketing costs.

- EMG will daily market, promote and advertise the international online-shop as well as all product and online-shop related press reports via media displays in all of EMG's (including EMG's subsidiaries) main websites and via all media channels. The goal was to reach the best possible consumers for Germantom's high-quality online-shop products.

- In consideration for the marketing, promotion and advertisement, EMG would receive 33% of Germantom's revenue before taxes ("gross revenue").

- The duration of the cooperation was set out for three years.

- Mr. Wayer also visualized the calculation by providing the following hypothetical calculation example: "If EMG gains 120 million people's attention through its marketing and promotion of the international online shop and even if only 5% visit Germantom's international online shop, it would result in 6 million online shop visitors per month. If only 2% of the 6 million international online-shop visitors, purchase any of the international online-shop products, Germantom would have 120,000.00 purchase orders per month. Each product price is set at around EUR 50, which would lead to a monthly revenue of EUR 6 million. Calculating with a margin of 20%, the gross profit would be in the amount of EUR

1.2 million per month (EUR 14.4 million per annum). Once the overhead costs are deducted, this would result in an estimated annual revenue of EUR 13 million. The 33% of the EUR 13 million would leave EMG with an annual profit of 4.3 million.

19.     On April 3, 2017, Mr. Ng confirmed via e-mail to Mr. Wayer that the key terms of the cooperation by and between Germantom and EMG were "concise and clearly written" and informed Mr. Wayer that he will send Mr. Tang/EMG an English version of the E-mail, dated March 30, 2017.

20.     On April 5, 2017, Mr. Ng summarized Mr. Wayer's E-mail, dated March 30, 2017 to Mr. Tang in English, as attached hereto as <u>Exhibit C</u>. In this E-mail to Mr. Tang, Mr. Ng precisely explained the cooperation by and between Germantom and EMG as follows:

> "[Mr. Wayer] will raise a fund of about 500,000 USD as start capital to build a small team with function such as book keeping, delivery management, marketing and administration. Harald [Wayer] will be the managing owner. ***EMG does not need to invest any money but shall be a partner whose contribution is powerful ads, PR articles and branding actions*** *[emphasis added]*. The "payment" to these ads is EMG gets 33% of the profit before tax. EMG has the right to access all book keeping."

As a result of Mr. Ng's E-mail, Mr. Tang was introduced to the concept of the cooperation by and between Germantom and EMG. The E-mail also explicitly points out the parties' rights and obligations.

21.     On or about April 25, 2017, Mr. Ng asked Mr. Wayer to draft a detailed business plan, which was then translated by Mr. Ng into English and is attached hereto as <u>Exhibit D</u> (the "<u>Business Plan</u>"). Mr. Wayer received the essential information/data relating to EMG as set forth in the Business Plan from Mr. Ng and Mr. Tang. The Business Plan was based on the key terms of the E-Mail dated March 30, 2017. In the Business Plan, Mr. Wayer suggested "to

start up an international-oriented online shopping mall[/shop] with European products and innovative products in co-operation with EMG-GERMANTOM.com in the world market."

22.     The Business Plan explained, among others, in detail the future business model of GERMANTOM.com "The Global Internet Shopping Mall for German and European Brands and New Products," including the success and additional success factors, the obligations of both parties as cooperative partners, the short-term and medium-term targets, including detailed calculations as well as revenue/profits based on feasible figures from the year 2018 onwards (annual sales, profit before tax, share for EMG, Remaining Profit before Tax).

23.     The Business Plan set forth EMG's obligations. Pursuant to Section 2.2 "Additional Success Factors" of the Business Plan, "EMG will run advertising campaigns on the online shop, its interesting products, and, above all, its product news, with press reports, whereby GERMANTOM and its products will also be made attractive to readers in many countries through the successful advertisements."  Pursuant to Section 2.3b. of the Business Plan "the Epoch Media Group will share the profits of GERMANTOM.com substantially with 1/3 over at least a few years."  In Section 3.2 entitled "Medium-term targets 2018, 2019 and 2020" the Business Plan sets forth numerical values for "year, revenue, gross profit and profit" and explains that "33% of the calculated profits are then accounted for EMG." The profit in the year 2018 was estimated at EUR 45 million, in the year 2019 at EUR 54.5 million and in the year 2020 at EUR 66 million.

24.     According to the Business Plan, Germantom would incur "a total cost of approximately 800,000 euros including the initial costs for the online market place, the office work space, the IT systems and / or the operational company" and  "Harald Wayer will raise the exact amount due without the need for bank loans, so GERMANTOM will be an almost debt-

free company, apart from shareholder stakes" (*see* Section 2.2d) of the Business Plan).

25.     On or about May 5, 2017, Mr. Ng sent Mr. Tang an E-Mail with a copy of the Business Plan, as attached hereto as <u>Exhibit E</u>. In this email, Mr. Ng requested Mr. Tang to "find time to read through [the Business Plan] before we meet in NY" and emphasized that Mr. Ng believed that "this project can capitalize the big unique user numbers of our media."

26.     Upon information and belief, Mr. Tang was satisfied and approved of the Business Plan and requested a draft cooperation agreement for his review and comment. However, Mr. Tang requested only a short agreement as the key terms were already set forth in the Business Plan.

27.     In the following, Mr. Wayer and Mr. Ng used the Business Plan in order to negotiate the terms of the draft cooperation agreement. Upon completion of the draft, which initially was in the German language, Mr. Wayer's son, who had no legal background, translated the document into English for Mr. Tang. Mr. Ng then sent Mr. Tang an E-Mail, as attached hereto as <u>Exhibit F</u>, in which Mr. Ng attached the draft and requested Mr. Tang to "give [his] comments to [the draft cooperation agreement]."

28.     On or about May 16, 2017, Mr. Wayer, Mr. Tang and Mr. Ng met in New York and discussed the terms of the Business Plan and the draft cooperation agreement. Mr. Tang did not have any questions and was highly satisfied with both documents.  On the same day, and in the presence of Mr. Ng, Mr. Wayer and Mr. Tang, acting on behalf of EMG, entered into the cooperation agreement (the "Cooperation Agreement"), as attached hereto as <u>Exhibit G</u>.

29.     Upon information and belief, at the time Mr. Tang signed the Cooperation Agreement on behalf of EMG, Mr. Tang knew that EMG itself is only an umbrella and that EMG itself is no legally existing corporation.

30.     Upon information and belief, Mr. Tang, however, deliberately and falsely signed the Cooperation Agreement on behalf of EMG as "President and CEO" of EMG (*see* p. 4 of the Cooperation Agreement).

31.     Upon information and belief, Mr. Wayer was therefore falsely made to believe and deliberately misled by Mr. Tang in the presence of Mr. Ng that EMG is an existing company and the contractual party of Germantom.

32.     The Cooperation Agreement was entirely based on the terms of the Business Plan. However, and contrary to the Business Plan, EMG increased the percentage interest of the gross profit it was entitled to from 33 percent to 50 percent (*see* Section 4 and Section 11 of the Cooperation Agreement).  The term of the Cooperation Agreement was "for a period of 6 years starting from the initial launch of the online shop presumably called GermanTom.com" (*see* Section 4 of the Cooperation Agreement).

33.     Pursuant to Section 1 of the Cooperation Agreement, EMG purported to have

> "…***around 300 million unique visitors*** [emphasis added] consisting of reader and NTD Internet TV viewers. On a monthly basis Epoch Media Group records over one billion page views" (*see* Section 1 of the Cooperation Agreement).

34.     However, contrary to its representations in the Cooperation Agreement and on other occasions, EMG only had 120 million unique users when the Cooperation Agreement was executed. It later turned out that EMG bought online user "klicks," so that it appeared as if EMG had 300 million unique users at the time the Cooperation Agreement was executed.

35.     Pursuant to Section 2 of the Cooperation Agreement, Mr. Wayer was to "establish a German Limited Liability Company (GmbH), or acquire an existing one," which

"will launch and operate an online ship expected to be called GermanTom." It was further "assumed that the online shop will be called GermanTom.com."  Pursuant to Section 3 of the Cooperation Agreement, "once the new company […] is expediently established or acquired by Mr. Wayer, Mr. Wayer will transfer all in the contract agreement concluded rights and duties to German Tom GmbH without any notice."

36.    The Cooperation Agreement set forth in Section 1 (entitled "Basis of the contract") inter alia, that

> "Epoch Media's motivation to conclude this agreement is to increase significantly its current income from sale of advertisement through a success-oriented advertising system in cooperation with Mr. Harald Wayer. This means, in particular, that Epoch Media Groups contact to ***millions of consumers*** [emphasis added] should be capitalized economically and seriously…"

37.    The Cooperation Agreement clearly set out the rights and obligations of the parties, among others, in Section 4 and 5:

> "GermanTom's goal is to offer and market German and European products to countries Epoch Media Group operates and is represented in. Additionally [,] GermanTom will offer product novelties to corresponding counties." In return for receiving 33 percent [*Ann: EMG in error neglected to revise 33% in Section 5 to 50% as stated in Section 4*] of income before taxes during the entire contract period, Epoch Media Group provides German Tom within its media group and branches accurate advertising for the brand German Tom and for all its products in stock.

38.    The Cooperation Agreement provides in Section 7 that

> "GermanTom will independently strive for shop products, product novelties, staff, office space, and other necessary investments. Epoch Media does not have to contribute any investments. Epoch Media is only responsible for advertising and press reports according to ***GermanToms specifications*** [emphasis added]. Any other necessary investment is carried out by German Tom GmbH."

39.    On or about May 16, 2017, at the meeting in New York and during the execution of the Cooperation Agreement, Mr. Tang emphasized and requested that due to his

lack of time and busy schedule, Mr. Ng shall be the key contact person on behalf of EMG for

Mr. Wayer in connection with any questions related to the Cooperation Agreement and Mr.

Wayer agreed. Mr. Tang, however, was kept updated by Mr. Ng and Mr. Wayer.

40.     On or about July 2017, the initial shareholders, Mr. Wayer, his wife Beate

Wayer as well as Mr. Ng himself (18% initial shares), founded the Germantom in order to

operate the international online shop in consideration of EMG's percentage of Germantom's

gross revenue.    Mr. Wayer was subsequently appointed as Chief Executive Officer of

Germantom.

41.     While being the managing member and 50% shareholder of Epoch Times

Europe GmbH, Mr. Ng was one of the initial investors of Germantom and was appointed initial

Chief Marketing Officer of Germantom. Mr. Ng further held himself out as being part of the

management of Germantom.

42.     On or about June 20, 2017 and June 23, 2017, Mr. Ng attended meetings

with Mr. Wayer and potential investors in Baden-Baden, Germany. Mr. Ng confirmed in such

meetings that EMG had 300 million unique users. Mr. Ng further confirmed and emphasized to

potential investors that Mr. Wayer and EMG executed the Cooperation Agreement which –

according to Mr. Ng - allowed Germantom to market, advertise and promote Germantom's

products/Germantom's international online-shop through using all of EMG's media channels

pursuant to Germantom's specifications in consideration of the 50 percentage of Germantom's

gross profits.  Mr. Ng further pointed out to potential investors that the favorable terms of the

Cooperation Agreement only existed due to his friendship with Mr. Tang, being a marketing

expert as well as being a founder of Epoch Times Europe GmbH. Mr. Ng further emphasized

that EMG will further grow rapidly and that such growth will also strongly benefit Germantom's

international online web shop and products.

43.     Mr. Ng initially managed the launching and marketing campaign process as well as the IT of Germantom's international online shop. Germantom did not have any key contact person directly at EMG, other than Mr. Ng, to discuss the marketing and promotion for the launch of Germantom's international online web shop and Products.   Germantom paid Mr. Ng as independent contractor in connection with his marking and IT management role a monthly salary of EUR 5,000.00.

44.     On or about July 26, 2017, Mr. Ng sent Mr. Tang an email attached hereto as <u>Exhibit H</u>, in which he briefed Mr. Tang on the progress in preparing the international online web shop GermanTom.com as follows:

- "The company GermanTom International GmbH has been registered. Its website GermanTom.com is also registered.

- Harald [Mr. Wayer] is the CEO and I am the "not so visible" EVP [Executive Vice President].

- Total capital invested is about 800,000 Euro.

- The Webshop is scheduled to be launched November 1. 2017.

- About 15 suppliers are being and will be negotiated. The Webshop aims at starting with 10 suppliers with a total of about 1000 products.

- IT system architecture defined. Personnel partly hired. 6 people are working now and it will be about 12 people in October. Office good for 20 people leased with an option for expanding to the double."

45.     Mr. Ng further asked Mr. Tang for his help as "GermanTom need[s] a contact person at your end. This person will receive input for PR articles, ads etc[.] and the

person will make sure these will be done in English and Chinese version of all epoch media. PLEASE GIVE ME THE NAME OF THE PERSON and his/her contact details, SO WE CAN START PLANNING THE MARKETING ACTIONS." (*see* E-Mail dated July 26, 2017).

46.     In the following, it turned out that the 300 million unique users/visitors were only 120 million.  Mr. Wayer, Mr. Ng and Mr. Tang agreed in order to solve the problem that Mr. Wayer/Germantom was allowed to use all of EMG's social media channels in addition to EMG's news media channels.

47.     On or about August 9, 2017, Mr. Ng informed Mr. Wayer that EMG's unique visitors in connection with EMG's estimated 180 million Facebook-followers had suddenly decreased to 99 million Facebook-followers due to a change by Facebook. Mr. Ng did not provide any further explanation in that regard. Despite the foregoing, EMG's homepage website continued to state that it has a total of 300 million unique users.

48.     On or about January 26, 2018, Mr. Wayer sent Mr. Tang a status email, dated January 26, 2018 (the "E-Mail, dated January 26, 2018"), as attached hereto as Exhibit I. Pursuant to the E-Mail, dated January 26, 2018, Mr. Wayer transferred any and all rights and obligations under the Cooperation Agreement to Germantom, as set forth in Section 3 of the Cooperation Agreement. Mr. Wayer pointed out that

> ***"Man Yan [Mr. Ng] reported to you*** [Mr. Tang] [emphasis added] in detail about the current state of the development of the GERMANTOM International GmbH and also discussed that [Germantom] will go online later than planned due to the considerable technical scope of the GERMANTOM International GmbH."

49.     In the same email, Mr. Wayer pointed out that Germantom hired five employees for the procurement of the goods alone and explained to Mr. Tang that Germantom's costs are rising. Mr. Wayer concluded that "[Germantom] presumably need[s] and organize[s] further capital up to the time [Germantom] goes online and cover[s] [Germantom's] costs

through sales."

50.     In order "to motivate the employees and the shareholders, and especially to organize additional capital...," Mr. Wayer also sent Mr. Tang a signed supplementary contract to the Cooperation Agreement in the E-Mail, dated January 26, 2018, as attached hereto as Exhibit J (the "Supplementary Agreement"). The Supplementary Agreement formally transferred the rights and obligations pursuant to the Cooperation Agreement from Mr. Wayer personally to Germantom, extended the initial six-year term to eight years and delayed the launch date of Germantom's international online web shop to April 2018.  Mr. Tang signed the Supplementary Agreement on March 7, 2018 again as "President of EMG" (see Supplementary Agreement). The Cooperation Agreement, as amended by the Supplementary Agreement, is hereinafter referred to as "Amended Cooperation Agreement."

51.     On or about March 31, 2018, EMG's website showed a decrease of overall 117 million viewer users on or about March 31, 2018.

52.     On or about April 24, 2018 Mr. Ng, acting on behalf of EMG and Mr. Wayer updated the Business Plan in order to gain more investors.  The updated version of the Business Plan is attached hereto and translated into English as Exhibit K (the "Updated Business Plan").

53.     The Updated Business Plan of 54 detailed pages showed the following table of content: business model; the partners of Germantom; marketing and distribution; the market; the competition; the SWOT analysis (chances & risks); financials; Germantom's team; Germantom's success; an action plan as well as an appendix.  Germantom's commencement of business operations was set for June 15, 2018 (see page 29 of the Updated Business Plan).  Page 1 of the Updated Business Plan presented EMG as cooperation partner of Germantom. EMG is

one of the worldwide players in the news and media industries and that EMG, as of April, 2017, EMG had "over 300 million unique users per month in 35 countries." The Updated Business Plan stated that only due to EMG's success will Germantom obtain an exclusive marketing and advertisement budget of estimated EUR 500 million until the year of 2026.

54.     On page 4 of the Updated Business Plan, Germantom was advertised as "The new Player in global eCommerce!" The Updated Business Plan further emphasized the exclusive partnership between EMG and Germantom and the marketing budget of EUR 5 million (*see* Page 4 of the Extended Business Plan).

55.     As exclusive partner of EMG, page 9 of the Updated Business Plan stated that Germantom was allowed to use all of EMG's individual news portals for free for marketing and advertisement purposes. As a result, Germantom would not have to pay for EMG's immense marketing budget in the estimated amount of EUR 500 million. EMG was strongly interested in Germantom's growth and will strongly support Germantom in its global expansion, as EMG will benefit from Germantom's growth due to the 50% share in Germantom's gross profits. Germantom was further explicitly allowed to market its products and the international online shop in all of EMG's social media channels. EMG worldwide had an estimate of "over 113,29 million social media followers." (*see* page 9 and page 30 of the Updated Business Plan).

56.     The Updated Business Plan explicitly shows on page 10 that "The partners of Germantom [are] – The Epoch Media *Group*" [emphasis added] and that "the two major parts of the corporate group of [EMG] are formed by:

> (1) NTD – a New York-based, globally operating news and entertainment company and
>
> (2) The Epoch Times, […] a private news company represented

throughout the world in 21 languages, 35 countries and on 5 continents." (*see* p. 10 of the Updated Business Plan, as defined below).

Although some parts of [the EMG] network are independent companies with headquarters in a number of countries, they are subject to the instructions and guidelines of EMG." (*see* further p. 10 of the Updated Business Plan, as defined below).

57.     On or about June 13, 2018, further investors joined Germantom. The Updated Business Plan was shown to all investors and Mr. Ng attended the meetings on behalf of EMG.

58.     On or about mid-2018, Germantom was ready to place advertisements for its international online shop and products through EMG's media and social media channels and notified EMG accordingly.

59.     EMG, however, thereafter failed to implement the advertising and marketing concept agreed upon by the Germantom and EMG in the Amended Cooperation Agreement. EMG referred Germantom from one contact within EMG's organization to another, and EMG did either not provide important market data or such market data was incomplete, thus rendering the placement of Germantom's advertisement for its international online shop and products through EMG's media and social media channels impossible.

60.     In order to clarify why EMG did not sufficiently cooperate and provide its resources to implement the advertising and marketing concept, Mr. Wayer's son met with Mr. Tang in New York. At no point in time during such meeting with Mr. Wayer's son did Mr. Tang argue that the Amended Cooperation Agreement was allegedly not valid or not binding between the parties. The objective of the meeting was, inter alia, to identify a key contact person directly

at EMG to help Germantom discuss the marketing and advertisement placement and Mr. Tang tried to find a sufficient solution to that regard. However, despite vague assurances to establish such a reporting contact, the meeting with Mr. Tang was, unsuccessful and nothing changed to the better.

61.     In the following, Mr. Wayer repeatedly mentioned that he was under pressure from Germantom's investors to consult with an attorney if EMG did not provide the advertising support owed under the Amended Cooperation Agreement.

62.     On August 20, 2018, the deterioration of the relationship between EMG and Germantom climaxed when Germantom suddenly received a letter from EMG's attorney claiming that Germantom was not allowed to call EMG a cooperation partner of Germantom. Then, on or about August 22, 2018, Mr. Ng sent Mr. Wayer an E-Mail stating that "EMG [EMG] has never promised daily advertising." EMG or the Defendants, however, never promoted, advertised or marketed Germantom's international online web shop nor its products at all.

63.     On September 9, 2018, Mr. Wayer's son emailed with an ad coordinator of EMG, Albert King ("Mr. King"), in connection with the advertising of Germantom's international online web shop and its products. Contrary to Mr. Ng's E-Mail on or about August 22, 2018, Mr. King emphasized that they "will arrange the ad delivery asap." However, EMG never did so at any point in time.

64.     On September 10, 2018, Mr. Wayer emailed Mr. Tang pointing out that EMG has breached its obligations pursuant to the Amended Cooperation Agreement.

65.     By letter, dated September 24, 2018, Mr. Wayer kept trying to reach an amicable solution with EMG's attorney. In a response letter dated October 1, 2018, EMG's attorney claimed that there was not any legally binding and valid agreement between EMG and

Germantom.   In this communication, he simply ignored the fact that the allegedly invalid Amended Cooperation Agreement had even been extended by the parties pursuant to the Supplementary Agreement.

66.     Germantom made several attempts times through its German attorney to find an amicable solution, which proved to be unsuccessful.

67.     As a result of Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Televisions' refusal and failure to perform its obligation of the Amended Cooperation Agreement, Germantom incurred the following direct and consequential damages in the total estimated amount of at least EUR 15,948,413.00 (equivalent $17,617,807.67) as of the date of this Complaint consisting of the following (collectively, the "Damages"):

> a.     Direct damages of the total losses of EUR 1,248,413.00 (equivalent $1,379,452.67), as shown in Germantom's balance sheets for 2018 and for January through August 2019, including, without limitation, payments of independent contractor invoices for Mr. Ng, payment of salary costs for a total of fifteen (15) marketing & IT employees hired by Germantom (*see* Milestones of Germantom as set forth on page 44 of the Updated Business Plan), monthly rental costs for the leased office space in Baden-Baden, Germany as of July 2018 (*see* Milestones of Germantom as set forth on page 44 of the Updated Business Plan); and all further costs incurred in connection with the setup of the IT system for the website and online shop. and
>
> b.     All lost profits are being calculated from the launch of

Germantom's operative business on June 15, 2018. Germantom would have gained the following lost profits if EMG would have fulfilled its obligations of 300 million unique users and by using the marketing budget of EUR 500 million for Germantom's international online web shop and products:

    i.    The Updated Business Plan showed on page 36, that Germantom estimated a gross profit of EUR 400,000.00 by end of the fiscal year 2018. Deducting the 50% owed to EMG, the gross profit result would have been EUR 200,000.00 for Germantom.

    ii.    As pages 40 et. seq. of the Updated Business Plan stated, Germantom conservatively estimated a gross profit amount of EUR 29 million by end of the fiscal year in 2019. Deducting the 50% for EMG, the gross profit result would have been EUR 14,5 million for Germantom.

### AS AND FOR A FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

68.    Germantom repeats and re-alleges the allegations contained in paragraphs "1" through "67" hereof as though more fully set forth herein.

69.    Upon information and belief, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television, both individually, in groups or collectively, were and are conducting their news and entertainment media business operations, at least in part, under the same name and umbrella EMG.

70.     Upon information and belief, EMG is, however, neither incorporated as legal entity nor is EMG registered to do business in the State of New York but uses a business address at 229 W. 28th Street, New York, New York 10001, USA.

71.     The Amended Cooperation Agreement is a valid and enforceable agreement entered into by and among Germantom, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG.

72.     The Amended Cooperation Agreement remained in full force and effect at all times relevant hereto.

73.     Germantom performed all of its obligations under the Amended Cooperation Agreement, including, without limitation, setting up an entity for the operation of the online shop, soliciting investors and raising capital for the same, hiring employees and independent contractors for the same, including, without limitation, Mr. Ng and setting up such online shop so that EMG's advertising channels could be used for marketing and selling products.

74.     Neither Epoch Times, Universal Communications Network, New Tang Dynasty nor New Tang Dynasty Television provided the 300 million unique users/viewers for advertising, nor marketed, promoted nor advertised Germantom's international web shop or products at any time through its global marketing and social media channels, thereby breaching its obligations pursuant to the Amended Cooperation Agreement.

75.     Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG further materially breached the Amended Cooperation Agreement by denying its existence and

repudiating its obligation set forth in it.

76.     By reason of the foregoing breaches, the Plaintiff sustained direct damages in an amount not less than $1,379,452.67 (equivalent to EUR 1,248,413.00 as of the date of this Complaint) altogether.

77.     Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Televisions' actions amounted to willful misconduct, and as such, Germantom is not only entitled to actual damages, but also consequential damages, including lost profits of not less than $16,238,355.00 (equivalent to EUR 14,700,000.00 as of the date of this Complaint).

78.     Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television are severally and jointly liable for the Damages.

### AS AND FOR A SECOND CAUSE OF ACTION
### (PROMISSORY ESTOPPEL)

79.     Germantom repeats and re-alleges the allegations contained in paragraphs "1" through "78" hereof as though more fully set forth herein.

80.     In the alternative, in the event that this Honorable Court reaches the conclusion that Germantom, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG have failed to enter into a valid agreement, Germantom is entitled to recovery of its damages based on the theory of Promissory Estoppel.

81.     Pursuant to the Amended Cooperation Agreement, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG promised to provide "German Tom within its

media group and branches accurate advertising for the brand German Tom and for all its products in stock" which advertising channels including, pursuant to Section 1 of the Amended Cooperation Agreement, access to "300 million unique visitors consisting of readers and NTD Internet TV viewers," in exchange for a 50% share on Germantom's annual profits. Furthermore, pursuant to the Updated Business Plan Germantom was "allowed to use all of EMG's individual news portals for free for marketing and advertisement purposes. As a result, Germantom would not have to pay for EMG's immense marketing budget in the estimated amount of EUR 500 million." In addition, pursuant to the Updated Business Plan Germantom was further explicitly allowed to market its products and the international online shop in all of EMG's social media channels.  The foregoing constitutes clear and unambiguous promises made by Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG.

82.     By setting up an entity for the operation of the online shop, soliciting investors and raising capital for the same, hiring employees and independent contractors for the same, including, without limitation, Mr. Ng and setting up such online shop so that EMG's advertising channels could be used for marketing and selling products, Germantom acted in reliance of Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Televisions' promises.

83.     As all of Germantom's actions were made for the purpose of setting up and running the online shop to use the promised advertising channels and reach EMG's users for advertising campaigns, Germantom's reliance was also reasonable and foreseeable for Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG.

84.     Germantom suffered the damages of at least $1,379,452.67 due to reliance on the promises of Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG.

85.     Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television are severally and jointly liable for the damages of at least $1,379,452.67.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(BREACH OF CONTRACT BY MR. TANG)**

86.     Germantom repeats and re-alleges the allegations contained in paragraphs "1" through "85" hereof as though more fully set forth herein.

87.     In the alternative, in the event that this Honorable Court reaches the conclusion that Germantom, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG have failed to enter into a valid agreement, Germantom is entitled to recovery of its damages based on the theory of Breach of Contract by Mr. Tang directly who knowingly acted by and behalf of a non-existing entity.

88.     Mr. Tang knew that EMG consists of, among others, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television acting under the same name and umbrella of EMG.

89.     Mr. Tang further knew that EMG itself did not exist as a legal entity at the time he signed the Amended Cooperation Agreement for and on behalf of EMG as "President and CEO" of EMG.

90.     Mr. Tang and Mr. Wayer clearly intended to create enforceable

obligations between them by entering into the Amended Cooperation Agreement.

91.     Mr. Tang deliberately and intentionally misled Mr. Wayer about EMG being the contractual party of Germantom.

92.     Mr. Wayer was not aware that EMG is neither incorporated as legal entity nor is EMG registered to do business in the State of New York.

93.     At no point in time, did Mr. Tang disclose the EMG media and news entity structure to Mr. Wayer.

94.     As Mr. Tang misrepresented to Mr. Wayer that he is the duly appointed CEO and President of EMG by signing the Amended Cooperation Agreement on behalf of EMG, he intentionally acted on behalf of a non-existent entity.

95.     By reason of the foregoing breaches, Mr. Tang is personally liable for Breach of Contract and shall be held personally responsible by this Honorable Court for the direct damages Plaintiff sustained in an amount not less than $1,379,452.67 (equivalent to EUR 1,248,413.00 as of the date of this Complaint) altogether.

96.     Mr. Tang's intentional and deceiving actions amounted to willful misconduct, and as such, Germantom is not only entitled to actual damages, but also consequential damages, including lost profits of not less than $16,238,355.00 (equivalent to EUR 14,700,000.00 as of the date of this Complaint).

97.     In the event that Germantom is entitled to recovery of its damages based on the theory of Promissory Estoppel, the Defendants are severally and jointly liable for the damages of at least $1,379,452.67.

### AS AND FOR A FOURTH CAUSE OF ACTION

### (FRAUDULENT MISREPRESENTATION BY MR. TANG)

98.     Germantom repeats and re-alleges the allegations contained in paragraphs "1" through "97" hereof as though more fully set forth herein.

99.     By executing the Cooperation Agreement as "President and CEO of EMG," Mr. Tang falsely represented to Mr. Wayer that Germantom's contractual party is EMG.

100.    By executing the Cooperation Agreement, Mr. Tang further falsely represented that Germantom would be working with EMG pursuant to the terms of the Cooperation Agreement.

101.    The basis of the Cooperation Agreement was that the "Epoch Media Group manages the brands Epoch Times Newspapers and Website, Youmaker, and NTD Television. [….] On a monthly basis Epoch Media Group records over one billion page views […]." Epoch Media Groups contact to millions of consumers should be capitalized economically […]" (*see* Section 1 of the Cooperation Agreement).

102.    The Cooperation Agreement further reads in Section 5 that "Epoch Media Group provides German Tom [Germantom] within its media group and branches accurate advertising for the brand German Tom [Germantom] and for all its products in stock."

103.    All financial and investments were solely carried out by Germantom. "Epoch Media Group [however] is only responsible for advertising and press reports according to GermantToms [Germantom's] specifications." (*see* Section 7 of the Cooperation Agreement).

104.    Mr. Tang knew that all the representations made to Mr. Wayer in the Cooperation Agreement were false.

105.    Mr. Tang knew that EMG was a non-existing entity and actually consisted of, among others, Epoch Times, Universal Communications Network, New Tang Dynasty and New Tang Dynasty Television. Despite Mr. Tang's knowledge, he still purported EMG as if it

was a legally existing entity.

106.     Mr. Tang further knew that EMG itself did not manage the brands Epoch Times Newspapers and Website, Youmaker, and NTD Television and that EMG itself did not record over one billion page views.

107.     Mr. Tang was precisely informed about the terms of the cooperation with Germantom (*see* e.g. E-Mail to Mr. Tang by Mr. Ng on April 5, 2017, as attached hereto as Exhibit C; receipt of the Business Plan on or about May 5, 2017 and the meeting by and among Mr. Wayer, Mr. Ng and Mr. Tang in New York to discuss the terms of the Business Plan and the draft cooperation agreement).

108.     Mr. Tang made the representations to Mr. Wayer with the intention of Mr. Wayer relying on such representations and to lure Mr. Wayer in entering into the Cooperation Agreement.

109.     Mr. Wayer relied on the fact that EMG was a legally existing entity and the contractual party of Germantom and would have not entered into the Cooperation Agreement knowing that EMG itself is a non-existing legal entity.

110.     Mr. Wayer further relied on Mr. Tang's representations that Germantom would be working with EMG pursuant to the terms of the Cooperation Agreement.

111.     As the sole obligation of EMG was to be responsible for advertising and press reports, Mr. Wayer completely relied upon that all representations made by Mr. Tang in the Cooperation Agreement were true.

112.     Due to the fraudulent representations of Mr. Tang and Germantom's reliance on such fraudulent representations, Germantom suffered direct damages in an amount not less than $1,379,452.67 (equivalent to EUR 1,248,413.00 as of the date of this Complaint)

altogether.

WHEREFORE, the Plaintiff asks the Court to enter judgment against the Defendants severally and jointly as follows:

a. Direct damages in the amount of not less than $1,379,452.67 (on the First Cause of Action (Breach of Contract);

b. And lost profits in the amount of not less than $16,238,355.00 on the First Cause of Action (Breach of Contract, to be determined at trial;

c. $1,379,452.67on the Second Cause of Action (Promissory Estoppel);

d. Direct damages in the amount of not less than $1,379,452.67 (on the Third Cause of Action (Breach of Contract by Mr. Tang);

e. And lost profits in the amount of not less than $16,238,355.00 on the Third Cause of Action (Breach of Contract by Mr. Tang, to be determined at trial;

f. Direct damages in the amount of not less than $1,379,452.67 (on the Fourth Cause of Action (Fraudulent Misrepresentation);

g. Pre-judgment interest on the foregoing causes of actions in the amount of 9% per annum;

h. For the costs and fees of this action, including attorneys' fees;

i. And for such other and further relief as to the court seems just and proper.

Dated:  February 3, 2020

SCHUMANN BURGHART LLP

/s/ Moritz Schumann
Moritz Schumann
Alexandra Beierlein
1500 Broadway, Suite 1902
New York, NY 10036
Telephone: (646) 502-5944
Facsimile: (646) 530-8286
Email: mschumann@sbuslaw.com
Email: abeierlein@sbuslaw.com